**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **BRENDA BLOOMFIELD,** | : | |
| Plaintiff, | : | Case No. 3:12 cv 0870 |
| v. | : | Judge Jeffrey J. Helmick |
| **WHIRLPOOL CORPORATION,** | : | Magistrate Judge Vernelius K. Armstrong |
| Defendant. | : | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Respectfully Submitted,

WHIRLPOOL CORPORATION

By: /s/ *Raven A. Winters*
One of Its Attorneys

Kent D. Riesen (Local Counsel)
ANSPACH MEEKS ELLENBERGER LLP
300 Madison Avenue
Suite 1600
Toledo, OH 43604
Telephone: 419.246.5757
Facsimile: 419.321.6979
kriesen@anspachlaw.com

Adam C. Wit (Admitted *Pro Hac Vice*)
Raven A. Winters (Admitted *Pro Hac Vice*)
LITTLER MENDELSON, P.C.
321 North Clark Street
Suite 1000
Chicago, IL 60654
Telephone: 312.372.5520
Facsimile: 312.372.7880
awit@littler.com
rwinters@littler.com

Attorneys for Defendant
WHIRLPOOL CORPORATION

Dated: April 16, 2013

# TABLE OF CONTENTS

PAGE

I. SUMMARY OF ARGUMENT/STATEMENT OF ISSUES ..... 1

II. STATEMENT OF UNDISPUTED MATERIAL FACTS ..... 2

A. Dawn Bower Complains That Bloomfield Is Harassing Her, An Investigation Ensues, And Both Employees Are Disciplined ..... 2

B. Bloomfield Threatens Osting When Osting Issues Bloomfield Her Discipline ..... 4

C. Bloomfield Gets An Order Of Protection Against Bower And Goes Out On Leave ..... 5

D. Bloomfield Threatens Osting Again While At Olive Garden ..... 6

E. Bloomfield Is Sent For An IME To Determine If It Is Safe For Her To Return To Work ..... 7

F. Bloomfield Is Uncooperative During The IME And Terminated For Insubordination ..... 10

III. LEGAL STANDARD ..... 11

IV. ARGUMENT ..... 11

A. Bloomfield's Disability Discrimination Claims Fail As A Matter Of Law ..... 12

1. Bloomfield Cannot Establish A *Prima Facie* Case ..... 12

2. Bloomfield Cannot Establish Pretext ..... 14

B. Bloomfield's Sex And Religious Harassment Claims Fail As A Matter Of Law ..... 15

1. Bloomfield's Harassment Claim Regarding Bower ..... 16

2. Bloomfield's Harassment Claim Regarding Osting ..... 17

C. Bloomfield's Title VII Retaliation Claim Fails As A Matter Of Law ..... 18

1. Bloomfield Cannot Establish A Causal Connection ..... 19

2. Bloomfield Cannot Establish Pretext ..... 19

**TABLE OF CONTENTS**
**(CONTINUED)**

**PAGE**

V. CONCLUSION ........................................................................................................ 20

CERTIFICATE OF COMPLIANCE PURSUANT TO LR 7.1(F) ............................................ 21

CERTIFICATE OF SERVICE ............................................................................................ 22

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................11

*Bowman v. Shawnee State Univ.*,
220 F.3d 456 (6th Cir. 2000)....................16, 18

*City of Columbus Serv. Comm'n v. McGlone*,
697 N.E.2d 204 (Ohio 1998)....................12

*Harter v. Chillicothe Long-Term Care, Inc.*,
4th Dist. No. 11CA3277, 2012 Ohio 2464 (May 29, 2012)....................16

*Jordan v. Kohl's Dep't Stores, Inc.*,
490 F. App'x 738 (6th Cir. July 27, 2012)....................18, 19

*Kuhn v. Washtenaw County*,
No 12-1609, 2013 U.S. App. LEXIS 4799 (6th Cir. Mar. 2013)....................19

*Kvintus v. R.L. Polk & Co.*,
3 F. Supp. 2d 788 (E.D. Mich. 1998)....................13

*Majewski v. Automatic Data Processing, Inc.*,
274 F.3d 1106 (6th Cir. 2001)....................14, 15

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....................11

*Mitchell v. Univ. Med. Ctr., Inc.*,
No. 3:07CV-414-H, 2010 U.S. Dist. LEXIS 80194 (W.D. Ky. Aug. 9, 2010)....................18

*Murphy v. Univ. of Cincinnati*,
72 F. App'x 288 (6th Cir. July 29, 2003)....................12, 17

*Palmer v. Circuit Court of Cook County*,
117 F.3d 351 (7th Cir. 1997), *cert. denied*, 522 U.S. 1096 (1998)....................13

*Perkins v. Harvey*,
368 F. App'x 640 (6th Cir. Mar. 9, 2010)....................16, 17

*Russell v. Univ. of Toledo*,
537 F.3d 596 (6th Cir. 2008)....................14, 20

**TABLE OF AUTHORITIES**
**(CONTINUED)**

**PAGE**

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502 (1993) ..... 12

*Sullivan v. River Valley Sch. Dist.*,
197 F.3d 804 (6th Cir. 1999) ..... 12, 13, 14

*Swanson v. Livingston County*,
121 F. App'x 80 (6th Cir. Jan. 19, 2005) ..... 17

*Tepper v. Potter*,
505 F.3d 508 (6th Cir. 2007) ..... 15

*Trepka v. Bd. of Educ.*,
28 F. App'x 455 (6th Cir. Jan. 24, 2002) ..... 17

**STATUTES**

O.R.C. § 4112 ..... 16

O.R.C. § 4112.02 ..... 12, 16

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ..... 11

## I. SUMMARY OF ARGUMENT/STATEMENT OF ISSUES

Plaintiff Brenda Bloomfield was terminated from Whirlpool in August of 2010 for insubordination. Bloomfield had been instructed to participate in an independent medical evaluation when she sought to return to work from a medical leave of absence in July of 2010, but she refused to cooperate during the exam. For that reason, she was fired.

The path that led to Bloomfield's termination began in September 2009 with a conflict she had with a co-worker named Dawn Bower. Bloomfield was no stranger to personality conflicts with co-workers. She had been counseled as early as her first year of employment about getting along with co-workers. In September 2009, Bower complained that Bloomfield was harassing her. Bloomfield, in turn, complained about Bower. Human Resources Manager Cindy Osting investigated all of the complaints and ultimately disciplined both employees.

When Osting delivered Bloomfield's discipline, Bloomfield made threatening comments towards Osting and her unborn child in the guise of a quote from the Bible. Several months later, Bloomfield took a medical leave of absence for depression and anxiety. While out on leave, in April 2010, Osting and her family encountered Bloomfield at a local Olive Garden restaurant. Again, Bloomfield made what Osting considered to be a threatening comment towards her. When the Company tried to investigate that incident, Bloomfield refused to cooperate and left a disturbing voicemail for the Director of Human Resources, Corri Wilcox.

In early July 2010, Bloomfield sought to return from her medical leave just as her disability benefits were about to expire. Given the timing of the request, coupled with her threatening conduct towards Osting, Whirlpool instructed Bloomfield to undergo an IME to confirm whether it was safe for her to return to work. During the IME, Bloomfield made it known to the physician – Dr. Charles Burke – that she was tape-recording the exam. When Dr. Burke advised Bloomfield that such conduct was prohibited, she refused to cooperate in deleting

the recording and left the exam before it was completed. It was this conduct which caused her termination.

Bloomfield claims that she was terminated because of an alleged disability (depression and anxiety) and in retaliation for filing an EEOC Charge (which she had done while on leave). The evidence does not support these claims. To the contrary, as discussed above and in greater detail below, Whirlpool concluded that Bloomfield's conduct during the IME was insubordinate, and that is why she was fired.

Bloomfield also claims that she was harassed and discriminated against because of her sex and religion. To support these claims, Bloomfield primarily points to her issues with Bower. Bloomfield, however, reads too much into this personality conflict. She and Bower may not have gotten along, but that fact does not constitute discrimination or actionable harassment. For these reasons, and as discussed in greater detail below, Whirlpool's Motion for Summary Judgment should be granted in its entirety.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

Whirlpool operates a dishwasher factory in Findlay, Ohio (the "Findlay Division"). Osting Aff., ¶1. Bloomfield began working at the Findlay Division as an assembler in August 2001. Pl. Dep. 32:18-33:2. During the first year of her employment, Bloomfield was counseled several times regarding personality conflicts that had been occurring at work, and she was advised to be courteous and treat others with respect. Pl. Dep. Ex. 15.

### A. Dawn Bower Complains That Bloomfield Is Harassing Her, An Investigation Ensues, And Both Employees Are Disciplined

In or around September 2009, Bloomfield began working on the Voyager assembly line. Pl. Dep. 40:13-20. Dawn Bower, another assembler, was already working on that line. Pl. Dep. 40:13-41:21. On or about September 16, 2009, Bower reported to Human Resources Manager

Cindy Osting that Bloomfield was harassing her by yelling at Bower across the line and sitting in a chair Bower often used in the break room. Osting Aff., Exs. A and B, WP 324-330, 348-50. Osting investigated Bower's complaint by interviewing multiple employees who worked in the area, and they confirmed that Bloomfield and Bower had not been getting along. Osting Aff., Ex. A, WP 348-350.

On September 21, 2009, Osting spoke to Bloomfield regarding the issues with Bower. *Id*. Bloomfield gave Osting her side of the story and claimed that Bower had called her a "bitch" after Bloomfield had sat in Bower's chair. Pl. Dep. 63:11-67:18; Pl. Dep. Ex. 4. In an effort to alleviate the conflict, Osting counseled both Bloomfield and Bower that: (1) they were not to speak to each other unless it was work-related; (2) they should contact their supervisor or Osting if any further conflicts arose; and (3) they could seek guidance from Anne Shiple (a counselor in the Employee Assistance Program) on conflict management. Osting Aff., Ex. A, WP 348-350.

Notwithstanding Osting's counseling, the conflict continued. Bloomfield, for example, told Osting that she believed Bower had moved her purse. *Id*. Bower, on the other hand, complained to Osting that Bloomfield had commented to other employees about how Bower was raised and had asked co-worker Nick Van Sky whether he would "do" Bower "doggy-style," how much it would take for Van Sky to "do" Bower, and commented about how much Bower was sweating. *Id*. *See also* Osting Aff., Ex. B, WP 339-340.

On September 25 and 28, 2009, Osting interviewed Bloomfield, Bower, and other employees on the assembly line about these issues. Osting Aff., Ex. A, WP 348-350. Bower acknowledged moving Bloomfield's purse, because it had been on a chair Bower needed to perform a particular job. *Id*. Bloomfield denied making the comments alleged by Bower. *Id*. Osting interviewed Van Sky, however, and he confirmed that Bloomfield had used the term

"doggy-style" in reference to another employee, and that Bloomfield had asked him if he wanted to lick the sweat off of Bower's head. Osting Aff., Exs. A and C, WP 338, 348-350; Van Sky Decl., WP 2485-2486.

After speaking with Van Sky, Osting again asked Bloomfield whether she had made the "doggy-style" comment or reference to Bower sweating. Osting Aff., Ex. A, WP 348-350. Again, Bloomfield denied making the comments. *Id*. Osting explained to Bloomfield that two people had told her that Bloomfield had made those comments; thus, Osting did not believe that Bloomfield was being truthful. *Id*. Accordingly, Osting suspended Bloomfield pending further investigation for being dishonest in the investigation. *Id*.

In the course of her investigation, Osting also confirmed that Bower had called Bloomfield a "bitch." *Id*. Osting therefore issued Bower a verbal warning for that inappropriate behavior. Osting Aff., Exs. A and D, WP 348-350, WP 401. Aside from the suspension (which ultimately lasted two days), Osting issued Bloomfield a written warning for the "doggy-style" and sweat-related comments. Osting Aff., Ex. A, WP 348-350; Pl. Dep. 143:8-11; Pl. Dep. Exs. 5, 6.

### B. Bloomfield Threatens Osting When Osting Issues Bloomfield Her Discipline

Osting met with Bloomfield on September 29, 2009 to issue her the written warning and the discipline memorializing Bloomfield's suspension. Osting Dep. 65:14-66:15, Osting Dep. Ex. 2; Pl. Dep. Exs. 5, 6. Bloomfield reacted to receiving the discipline by quoting two Bible verses to Osting. Osting Dep. Ex. 2. The first quote was from the Book of Acts. *Id*. Then, Bloomfield quoted Romans 12:19 (King James Version: "Dearly beloved, avenge not yourselves, but rather give place unto wrath: for it is written, Vengeance is mine; I will repay,

saith the Lord") and told Osting that she was praying for Osting and Osting's baby.[1] *Id.*; Osting Dep. 78:3-81:12; Pl. Dep. 154:5-159:12. Osting was pregnant at the time and believed that Bloomfield was "willing God harm" on Osting and her baby, given Bloomfield's tone and the fact that she stated the quote in response to receiving discipline from Osting. Osting Dep. 62:20-63:5, 80:6-81:12.

A few days later, Bloomfield came to see Osting again and began to speak about religion. Osting Dep. Ex. 2. Osting advised Bloomfield that she did not want to discuss religion with her, but that, if Bloomfield had a question about something work-related, she would be happy to help her. *Id*. Bloomfield left Osting's office without further discussion. *Id*.

### C. Bloomfield Gets An Order Of Protection Against Bower And Goes Out On Leave

On or about December 20, 2009, Bloomfield claims that Bower confronted Bloomfield and her daughter at a local Wal-Mart. Pl. Dep. 178:4-182:2. Eleven days later, Bloomfield filed an Order of Protection against Bower, and the court temporarily issued the Order of Protection, pending a hearing. Pl. Dep. 184:8-185:1; Pl. Dep. Exs. 7, 8. Pursuant to the Order, Bower had to stay 50 feet away from Bloomfield at work and 500 feet away from her at all other times. Pl. Dep. 199:18-23; Pl. Dep. Ex. 8.

When the Findlay Division received notice that Bower had been served with the Order, Human Resources Generalist Kevin Traxler assigned Bower to the Endeavor line and Bloomfield to the New Generation line in order to comply with the distance requirements. Traxler Dep. 33:22-35:10. Bloomfield, however, never worked in that new assignment. On January 19, 2010, the same day she was informed of her reassignment, Bloomfield requested a medical leave of absence. Pl. Dep. 208:9-12, 210:19-211:25.

[1] The next verse states, "[t]herefore if thine enemy hunger, feed him; if he thirst, give him drink: for in so doing thou shalt heap coals of fire on his head." Romans 12:20 (King James Version).

Whirlpool provides eligible employees with up to 26 weeks of disability benefits. Osting Aff., Ex. G, WP 199, 230; Pl. Dep. Ex. 2. Bloomfield's leave request was approved, and Bloomfield ultimately stayed out on leave from January until July of 2010. Pl. Dep. 211:24-25, 237:8-10.[2] Approximately two months after going out on leave, on March 21, 2010, Bloomfield filed an EEOC Charge of Discrimination against Whirlpool, alleging that she had been discriminated against based on her sex and religion and in retaliation for complaining about harassment.[3] Pl. Dep. Exs. 16, 17.

### D. Bloomfield Threatens Osting Again While At Olive Garden

On or about April 17, 2010, Osting, along with her husband and baby daughter, went to the Olive Garden restaurant on Tiffin Avenue in Findlay, Ohio. Pl. Dep. 220:10-223:25. As Osting and her family were walking to their table, Osting saw Bloomfield in the bar area. Osting Dep. 51:14-54:1, 57:9-58:14; Osting Dep. Ex. 1. Bloomfield made eye contact with Osting and told her in an unpleasant and pointed tone: "Yours is coming, Cindy." *Id.* Given Osting's involvement in investigating and disciplining Bloomfield, and Bloomfield's previous quote from Romans 12:19, Osting felt threatened by Bloomfield's statement and immediately left the restaurant. *Id.*; Osting Dep. 58:9-63:5.

When Osting returned to work on April 19, 2010, she reported the incident to the Director, Human Resources Corri Wilcox. Osting Dep. 63:6-16. Wilcox called and asked to meet with Bloomfield (who was still on medical leave) at the Findlay Division to discuss the Olive Garden incident, but Bloomfield refused. Pl. Dep. 225:3-234:5; Pl. Dep. Ex. 10. Bloomfield did agree to talk over the phone, however, and claims that, during the conversation

---

[2] On March 29, 2010, while Bloomfield was out on leave, the Order of Protection against Bower was overturned, and the judge found that Bloomfield's allegations were not credible. Pl. Dep. 191:5-192:23; Pl. Dep. Ex. 9.

[3] On January 26, 2011, the EEOC Detroit Field Office issued a Dismissal and Notice of Rights with regard to that Charge, Osting Aff., Ex. F, WP 360, and Bloomfield did not file a lawsuit within 90 days of receiving that Notice of Rights.

with Wilcox, she denied having threatened anyone. *Id*. Bloomfield later left Wilcox the following voicemail:

> Hi Corri. Just wanted to say I did receive both of your harassing letters and I'm not for sure what that statement means but it probably means I will have your job. But anyway, I do have proof of our conversation on May 7th and your letters don't seem to match my proof. See I am a child of the living God and I only speak truth. And if you know the word of God then you know that you are not to bring a charge against one of God's chosen. If I were you I would fall on my face and ask God to forgive me for being a liar. I already have a lot of evidence against everyone involved and Cindy knows I am notorious for recording conversations. And you will do well not to wait 'til May 18th for me to take part in your fabricated investigation. God bless.

Pl. Dep. 236:13-19; Pl. Voicemail.[4]

**E. Bloomfield Is Sent For An IME To Determine If It Is Safe For Her To Return To Work**

When her disability benefits were about to expire, Bloomfield told her treating psychiatrist, Dr. Brad Bundy, that she was ready to return to work, and he gave her the following note: "Brenda Bloomfield is cleared from my treatment perspective to return to work 7-21-10." Pl. Dep. 237:4-7; Pl. Dep. Ex. 11. Dr. Bundy had been seeing Bloomfield since approximately March 2010. Bundy Dep. 43:19-44:24. Dr. Bundy did not independently investigate whether it would be safe for Bloomfield to return to work. *Id*. at 130:1-131:3. Rather, he believed that Bloomfield was able to return to work based on information he had received from her and a friend whom Bloomfield had brought to a session with her for support. *Id*. at 128:7-131:3. Bloomfield did not inform Dr. Bundy of the Olive Garden incident or the other conflicts that she

[4] Although Bloomfield's voicemail references "letters," there was only one letter, and it was not "harassing." Rather, Wilcox summarized her May 7th call with Bloomfield and requested that Bloomfield participate in the investigation. Pl. Dep. Ex. 10. Bloomfield has never produced the "proof" she claims to have had of the "conversations."

had experienced with her co-workers or in her personal life.[5] *Id*. at 59:3-61:20, 75:20-76:25, 92:17-94:9, 101:9-103:8, 105:8-107:1. Dr. Bundy testified that, if Whirlpool had a concern about safety, it was up to Whirlpool to take the necessary steps to ensure that Bloomfield did not pose a risk. *Id*. at 108:9-17, 135:6-9. Dr. Bundy further testified that, if he had current and valid information regarding some of the personal conflicts that had occurred between Bloomfield and her co-workers, he would have recommended that she resolve them before returning to work. *Id*. at 133:18-134:14.

As part of the return-to-work process, Bloomfield visited the Findlay Division's Health Center on July 16, 2010 to undergo a drug screen and schedule an appointment for a return-to-work evaluation with the Findlay Division's physician, Dr. Scott Leslie.[6] Dye Dep. 99:4-100:10; Dye Dep. Ex. 9. After the drug screen, Jeanna Powell, a medical office assistant at the Findlay Division, informed Human Resources Generalist Sue Dye (who supervised the Health Center) that Bloomfield had told Powell that she needed to return to work but was not sure if she was ready "with everything that's going on." Dye Dep. 19:16-21:20, 109:9-110:23; Dye Dep. Ex. 15. Dye was already concerned at that point that Bloomfield was returning to work because her disability benefits were about to expire. Dye Dep. 32:20-33:6. Dye was also aware of the threat that Bloomfield had made to Osting. *Id*. at 33:7-11. Dye therefore thought Bloomfield should be sent for an independent medical examination ("IME") to ensure that it was safe for Bloomfield to return to work and shared that view with the Division's then-current Director,

---

[5] Bloomfield also told Dr. Bundy that she did not have any access to guns when, in fact, she owned several guns and ammunition. Bundy Dep. 105:8-106:3; Pl. Dep. 304:20-306:18.

[6] Dr. Leslie was employed by Fremont Memorial Hospital, and the Hospital's occupational medicine department was through Health Link. Leslie Dep. 9:14-22. Health Link had several clinics throughout the geographical area, including the one at the Findlay Division. *Id*. Dr. Leslie worked at the Findlay Division for a few hours every week on Tuesdays and Thursdays. *Id*. at 10:5-15.

Human Resources Jennifer Hanna.[7] Hanna Dep. 9:14-16, 18:9-20:23; Dye Dep. 36:4-17, 43:24-46:5. Hanna agreed with this course of action, so Dye spoke to Dr. Leslie about the idea of sending Bloomfield for an IME. *Id.*; Dye Dep. 34:19-38:13, 39:17-41:5; Leslie Dep. 11:20-12:4, 35:15-36:11.

Separate from his conversation with Dye, Dr. Leslie was aware of Bloomfield's voicemail to Wilcox, because Wilcox had shared it with him and expressed concerns about Bloomfield's aggressive statements. Leslie Dep. 34:9-20. Dr. Leslie also questioned whether Dr. Bundy had all of the information regarding the aforementioned issues.[8] Leslie Dep. 22:10-22. Based on his knowledge of Bloomfield's issues within the workplace and Dye's concerns, Dr. Leslie concluded that Bloomfield should be sent for an objective opinion about whether she could safely return to work. Leslie Dep. 40:17-41:21.

On July 20, 2010, Bloomfield saw Dr. Leslie in the Health Center for her return-to-work evaluation and presented Dr. Bundy's July 13, 2010 note. Leslie Dep. 10:16-11:2; Leslie Dep. Ex. A. Dr. Leslie informed Bloomfield that she needed to provide a note from Dr. Bundy describing any work restrictions she might have.[9] Leslie Dep. 17:3-20, 42:9-43:9; Leslie Dep. Ex. A. Dr. Leslie also informed Bloomfield that, due to conflicts that had occurred between her and other employees, he was referring her for an IME to ensure that she could safely return to work. Leslie Dep. 19:12-20:2; Leslie Dep. Exs. A, B.

Dye selected Dr. Charles S. Burke to perform the IME based on a recommendation from

---

[7] Hanna had replaced Wilcox as Director, Human Resources. Osting Dep. 24:21-26:12.

[8] At some point, Dr. Leslie had contacted Dr. Bundy to determine whether Dr. Bundy was aware of the issues that Bloomfield had been experiencing. Leslie Dep. 22:10-28:20. Dr. Bundy listened to Dr. Leslie but would not confirm or deny that he was aware of any issues concerning Bloomfield. *Id.* at 43:10-22.

[9] The Health Center needed this note because Dr. Bundy's July 13, 2010 note merely stated she could return but did not confirm whether she would have any restrictions once she was returned to work. Leslie Dep. 17:3-20; Leslie Dep. Ex. A. On or about July 22, 2010, Dr. Bundy provided a note that stated Bloomfield could return to work without any restrictions. Leslie Dep. Ex. D.

another Whirlpool Division and scheduled the IME for Tuesday, July 27, 2010 at 2:00 p.m. Dye Dep. 41:6-24, 98:12-99:2; Dye Dep. Ex. 1. Dye sent Dr. Burke a letter in advance of the IME that summarized Whirlpool's concerns and asked Dr. Burke to evaluate Bloomfield to determine: (1) whether Bloomfield was a danger to herself or her co-workers; (2) whether she had recovered sufficiently to return to work; (3) whether she could return to the work environment and interact with co-workers and Human Resources safely; (4) if she had not recovered to return to work, when he anticipated that she would recover; and (5) what diagnosis and treatment he recommended for her. Dye Dep. Ex. 1.

### F. Bloomfield Is Uncooperative During The IME And Terminated For Insubordination

Bloomfield arrived at Dr. Burke's office for the IME as scheduled. Burke Dep. 27:22-28:3. At some point during the IME, Bloomfield took a tape recorder out of her purse and turned it off. Burke Dep. 51:17-53:23. Dr. Burke informed Bloomfield that she was not allowed to tape the session, and he would not complete the evaluation or send a report to Whirlpool unless the tape was erased. *Id*. at 54:5-19. He then offered to magnetically erase the tape. *Id*. at 52:6-53:3. When Dr. Burke left the exam room to get the magnetic eraser, Bloomfield left the office, thereby ending the attempted IME. *Id*. After the attempted IME, Bloomfield reported her version of what had happened at Dr. Burke's office to the Perrysburg police department. Pl. Dep. 265:11-271:10; Pl. Dep. Ex. 13. In her voluntary statement to the police, Bloomfield acknowledged that Dr. Burke had warned her that, if she did not give him the tape, he would not send the report to Whirlpool. Pl. Dep. Ex. 13. Bloomfield's account of her response was, "I just shrugged my shoulders (because I don't care if he does or doesn't give them my evaluation)."[10]

[10] The police never contacted Dr. Burke regarding Bloomfield's voluntary statement, and no action was taken against him. Burke Dep. 60:8-62:16; Burke Dep. Ex. F; Pl. Dep. 265:11-271:10.

*Id*.

After the attempted IME, Dr. Burke called Dye, explained what had occurred, and advised Dye that he could not conclude his evaluation of Bloomfield's ability to return to work. Burke Dep. 56:20-58:1; Dye Dep. 85:19-87:2. Dr. Burke confirmed his conclusions in a letter to Dr. Leslie, stating that Bloomfield's behavior demonstrated "non-cooperation with the psychiatric evaluation."[11] Burke Dep. 58:5-60:7; Burke Dep. Ex. E. He further recommended that Whirlpool "follow whatever appropriate administrative action [it] deem[ed] necessary." Burke Dep. Ex. E. After receiving the information from Dr. Burke, and reviewing the circumstances surrounding the situation, Hanna concluded that Bloomfield's refusal to cooperate during the IME constituted insubordination. Hanna Dep. 17:7-18:8, 31:18-32:21, 34:18-35:5. Based on that conclusion, Hanna decided to terminate Bloomfield's employment, effective August 2, 2010. Traxler Dep. 40:18-41:1; Traxler Dep. Ex. 1; Osting Dep. 82:7-83:19; Hanna Dep. 17:7-17, 23:3-6, 34:18-35:5.

## III. LEGAL STANDARD

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, Bloomfield must show that a reasonable jury could return a verdict in her favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). Metaphysical doubt as to the material facts does not create a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).

## IV. ARGUMENT

Bloomfield can rely upon direct or circumstantial evidence to prove her discrimination

[11] Dr. Burke believed that Bloomfield was uncooperative in the sense that she had not cooperated with the standards of the evaluation by purposefully recording the session. Burke Dep. 39:12-40:23. Additionally, he believed that the fact that she was recording it called into question whether she had been honest during the IME. *Id*.

and retaliation claims. Direct evidence is usually an unequivocal assertion that the adverse action at issue was taken because of a protected category. *Murphy v. Univ. of Cincinnati*, 72 F. App'x 288, 294 (6th Cir. July 29, 2003). Bloomfield has not set forth any such evidence. She must therefore prove her discrimination and retaliation claims with indirect evidence.

### A. Bloomfield's Disability Discrimination Claims Fail As A Matter Of Law

#### 1. Bloomfield Cannot Establish A *Prima Facie* Case

Bloomfield claims that she was terminated because of an alleged disability. To establish a *prima facie* case of disability discrimination under the ADA and O.R.C. § 4112.02, Bloomfield must show that: (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of her job with or without a reasonable accommodation; and (3) she was terminated because of her disability. *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999).[12] If Bloomfield can do so, the burden of production, not proof, shifts to Whirlpool to articulate a legitimate, nondiscriminatory reason for her termination. *Id*. Once Whirlpool meets its burden, Bloomfield must produce sufficient evidence to show that Whirlpool's articulated reason is actually a pretext for disability discrimination. *Id*. The question at all times remains whether Whirlpool intentionally discriminated against Bloomfield, and the burden of proof with regard to that question remains at all times with Bloomfield. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

For reasons similar to those addressed by the Sixth Circuit in *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804 (6th Cir. 1999), Bloomfield cannot show that she was otherwise qualified to perform the essential functions of her job or that she was terminated because of her

[12] Although Bloomfield has brought disability discrimination claims under both the ADA and O.R.C. § 4112.02, Ohio courts generally look to federal law in analyzing claims under O.R.C. § 4112.02. *See City of Columbus Serv. Comm'n v. McGlone*, 697 N.E.2d 204, 206-07 (Ohio 1998). Accordingly, these claims should be treated as one for the purposes of deciding the instant Motion.

disability.[13] In *Sullivan*, a teacher had engaged in ongoing behavioral issues, such as disruptive and abusive verbal outbursts, shoving papers in the faces of individual members of the school board, and threatening school board members. *Id*. at 808-809. As a result, the school district ordered the teacher to undergo mental and physical fitness-for-duty examinations. *Id*. at 809. The teacher refused and was later issued a three-year, unpaid suspension. *Id*. at 809-810. The teacher sued, alleging that his suspension without pay for refusing to submit to the medical exams constituted disability discrimination. *Id*.

The Sixth Circuit affirmed summary judgment in favor of the employer. *Id*. at 811-814. The court found that the school district had not run afoul of the ADA by ordering the medical exam, because the teacher's behavior had given the school district reason to seek further information about his fitness for continued employment.[14] *Id*. at 812. *See also Kvintus v. R.L. Polk & Co*., 3 F. Supp. 2d 788, 796 (E.D. Mich. 1998) (refusing to infer perception of disability from an employer's offer to plaintiff of a paid medical disability leave and noting that "to hold otherwise would unnecessarily inhibit employers from any inquiry regarding the status of behavior on the part of an employee that an employer may perceive as inappropriate for the employment environment."). The court also held that the teacher was not otherwise qualified for the position due to the threats that he had made to the school board members. *Sullivan*, 197 F.3d at 813 ("Since 'threatening other employees disqualifies one' from a job, Sullivan should not be able to meet this requirement.") (*quoting Palmer v. Circuit Court of Cook County*, 117 F.3d 351, 352 (7th Cir. 1997), *cert. denied*, 522 U.S. 1096 (1998)). Finally, the Court found that the teacher could not establish the final prong of his *prima facie* case, because he had been

[13] For the purposes of this summary judgment motion only, Whirlpool assumes that Bloomfield can establish the first prong of her *prima facie* case.

[14] Bloomfield's Complaint does not assert a claim that sending her for the IME violated the ADA's medical exam provisions. *See* Docket No. 1. Even if it had, Whirlpool's decision to send her for the IME did not violate those provisions, as set forth in *Sullivan*.

suspended for refusing to undergo the medical exam (which itself was not discriminatory). *Id*. at 813.

Just as in *Sullivan*, Bloomfield cannot establish that she was otherwise qualified for her position, given her threatening conduct towards Whirlpool employees. 197 F.3d at 813. Like the school district in *Sullivan*, Whirlpool required Bloomfield to undergo an IME before she returned to work in July 2010 because of her threatening conduct, coupled with the timing of her request to return to work. Bloomfield's refusal to cooperate during the IME caused her termination, not any disability she may have had. Accordingly, summary judgment should be granted on Bloomfield's disability claims. *See Sullivan*, 197 F.3d at 812-814.

**2. Bloomfield Cannot Establish Pretext**

Whirlpool had a legitimate, nondiscriminatory reason for terminating Bloomfield: she did not cooperate during the IME and was therefore insubordinate. *See Sullivan*, 197 F.3d at 813. The burden now shifts to Bloomfield to establish that this legitimate, nondiscriminatory reason is a pretext for disability discrimination.

As long as an employer has an honest belief in its proffered nondiscriminatory reason, the employee cannot establish that the reason was pretextual, even if it is ultimately shown to be incorrect. *See Majewski v. Automatic Data Processing, Inc*., 274 F.3d 1106, 1117 (6th Cir. 2001). "An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied on the particularized facts that were before it at the time the decision was made." *Id*. (internal quotations omitted). "[T]he decisional process need not be optimal, only reasonably informed and considered." *Russell v. Univ. of Toledo*, 537 F.3d 596, 605 (6th Cir. 2008).

There is no evidence that Whirlpool did not honestly believe, based upon the information it had at the time that the decision was made, that Bloomfield had been uncooperative during the

IME, and that her conduct amounted to insubordination. Indeed, Dr. Burke had reported that to Dye during a telephone conversation and wrote a letter to Dr. Leslie stating the same. Bloomfield does not dispute that she secretly recorded the IME, or that Dr. Burke warned her that, if she did not give him the tape, he would not send the report to Whirlpool. In fact, her response to the latter was, "I just shrugged my shoulders (because I don't care if he does or doesn't give them my evaluation)." Pl. Dep. Ex. 13. Thus, while Bloomfield may disagree with Whirlpool's conclusions that her conduct was uncooperative and insubordinate, her opinion is not enough to establish pretext. *Majewski*, 274 F.3d at 1117. Bloomfield's disability discrimination claims should therefore be dismissed.

### B. Bloomfield's Sex And Religious Harassment Claims Fail As A Matter Of Law

Bloomfield claims that Bower harassed her due to her sex and religion when she called her a "bitch," used derogatory language towards her (i.e., told her to "kiss her ass"), stared at her, and confronted her at Wal-Mart. Pl. Dep. 169:17-178:16. Bloomfield also claims that Osting harassed her because of her religion by: (1) telling her to stop talking about God; (2) accusing her of engaging in the conversation with Van Sky and suspending her "without any evidence"; and (3) not investigating anything that Bloomfield or other employees brought to her attention. Pl. Dep. 167:1-24.[15]

To establish her harassment claims, Bloomfield must show that: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based

[15] Although Bloomfield's Complaint alleges sex and religious discrimination claims as well, she indicated in her deposition that she was asserting harassment claims. *See* Pl. Dep. 169:17-178:16, 167:1-24. Even if she had intended to assert sex and religious discrimination claims, they would fail because she has not presented any evidence of a similarly-situated individual who was treated more favorably. *See Tepper v. Potter*, 505 F.3d 508, 515-517 (6th Cir. 2007). Moreover, the only possible adverse action she can assert with respect to those claims is the two-day suspension, and she cannot establish that, based on the facts that Osting had at the time, Osting did not honestly believe that she had lied during the investigation. Thus, she cannot show pretext. *Majewski*, 274 F.3d at 1117.

on her religion and sex; (4) the harassment had the effect of unreasonably interfering with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) Whirlpool is liable. *Bowman v. Shawnee State Univ*., 220 F.3d 456, 462-463 (6th Cir. 2000). [16] When analyzing Bloomfield's harassment claims, this Court must "distinguish between harassment and discriminatory harassment in order to ensure that Title VII does not become a general civility code." *Id*. at 464 (internal quotations omitted). Moreover, "[t]he work environment as a whole must be considered rather than a focus on individual acts of alleged hostility." *Id*. at 463.

**1. Bloomfield's Harassment Claim Regarding Bower**

Bower's conduct towards Bloomfield was not discriminatory harassment. At worst, Bower may have been motivated by the personality conflict that existed between her and Bloomfield, as was the case in *Perkins v. Harvey*, 368 F. App'x 640 (6th Cir. Mar. 9, 2010).

In *Perkins*, the plaintiff claimed that he had been subjected to a hostile work environment based on his race when co-workers "wanted to actually fistfight" him, used profanity towards him, and failed to ring the ship's "wake-up bell" in front of his quarters, which caused him to be late for his shift. *Id*. at 646. The court affirmed summary judgment on this claim, because the plaintiff's "pure supposition" was all that linked his race to a series of "garden-variety personality conflicts." *Id*.

The same is true in the instant case. There is no evidence that links the personality conflict between Bower and Bloomfield to Bloomfield's sex or religion. In fact, Bloomfield admitted in her deposition that she believed that Bower treated everyone this way, regardless of their sex. Pl. Dep. 173:16-24. Moreover, there is no evidence that Bower knew Bloomfield's

[16] Although these claims are brought pursuant to O.R.C. §4112.02, Ohio courts have held that federal case law interpreting Title VII is "generally applicable" to cases brought under O.R.C. § 4112. *See Harter v. Chillicothe Long-Term Care, Inc*., 4th Dist. No. 11CA3277, 2012 Ohio 2464, ¶16 (May 29, 2012).

religion. Pl. Dep. 175:22-176:20. Thus, similar to *Perkins*, the conduct Bloomfield attributes to Bower is not actionable harassment. *See Perkins*, 368 F. App'x at 646-647. *See also Murphy*, 72 F. App'x at 295 (a simple personality conflict is not actionable discrimination); *Trepka v. Bd. of Educ*., 28 F. App'x 455, 461-462 (6th Cir. Jan. 24, 2002) (holding that a "contentious oral confrontation" involving "stern words" did not amount to harassment).

Even if Bower's conduct were actionable harassment, however, Whirlpool is not liable as a matter of law. Upon learning of Bloomfield's concerns, Whirlpool investigated the matter and took corrective action against Bower. There were no other incidents between Bower and Bloomfield in the workplace after that action was taken. *See e.g., Swanson v. Livingston County*, 121 F. App'x 80, 84 (6th Cir. Jan. 19, 2005) (affirming summary judgment on co-worker sexual harassment claim where the employer began an internal investigation of the plaintiff's allegations and issued disciplinary measures to those individuals who had violated its policies).

**2. Bloomfield's Harassment Claim Regarding Osting**

Bloomfield's harassment claim regarding Osting should likewise be dismissed. While Bloomfield claims that Osting accused her of engaging in the conversation with Van Sky and suspended her "without any evidence," she admits that she had no personal knowledge of what Van Sky had told Osting or what Osting had done to investigate the issue. Pl. Dep. 134:22-138:15, 167:17-20. In fact, when Osting suspended Bloomfield, Osting had already received information from two witnesses that Bloomfield had engaged in the behavior at issue. Osting Aff., Ex. A, WP 348-350. Furthermore, Osting investigated issues that had been brought forth by both Bower and Bloomfield, which resulted in both of them receiving disciplinary action. *Id.*

Bloomfield also claims that Osting harassed her by telling Bloomfield not to talk about God. As discussed above, Osting recalls telling Bloomfield not to discuss religion with her (Osting). Semantics aside, the simple fact that Osting told Bloomfield on one occasion that she

did not wish to discuss religion does not constitute religious harassment. *See Bowman*, 220 F.3d at 463 ("A hostile work environment occurs when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."). Bloomfield's claim in this regard is similar to the claim addressed in *Mitchell v. Univ. Med. Ctr., Inc*., No. 3:07CV-414-H, 2010 U.S. Dist. LEXIS 80194 (W.D. Ky. Aug. 9, 2010).

In *Mitchell*, the plaintiff was asked not to discuss religion at work when several employees expressed fear and concern about religious discussions that the plaintiff had with them about when the world was going to come to an end. *Id*. at 3-8. The court granted summary judgment, noting that there was no evidence anyone degraded or insulted the plaintiff because of her religion, and she had discussed her religion at work for a while without any incident. *Id*. at 25-26. The plaintiff was told not to discuss religion only after she began having religious discussions about her calculations as to when the world was coming to an end. *Id*. at 26.

Just as in *Mitchell*, Bloomfield has presented no evidence that she was degraded or insulted because of her religion, and Osting's directive came only after Osting felt threatened by Bloomfield's religious comments. Summary judgment should therefore be granted on Bloomfield's harassment claim regarding Osting. *Mitchell*, 2010 U.S. Dist. LEXIS 80194, at *8.

**C. Bloomfield's Title VII Retaliation Claim Fails As A Matter Of Law**

Bloomfield claims that she was terminated in retaliation for having filed her first EEOC Charge of Discrimination. To establish her retaliation claim, Bloomfield must show: (1) she engaged in protected activity; (2) Whirlpool knew of the protected activity; (3) Whirlpool subsequently took an adverse action against her; and (4) there was a causal connection between the protected activity and the adverse action. *Jordan v. Kohl's Dep't Stores, Inc*., 490 F. App'x 738, 742 (6th Cir. July 27, 2012). The same burden-shifting analysis discussed with regard to

Bloomfield's discrimination claims applies here. *See id.* and *supra*, p. 12. Bloomfield's retaliation claim fails because she cannot establish a causal connection between the filing of her first EEOC Charge and her termination, nor can she show that Whirlpool's legitimate, nondiscriminatory reason for terminating her is pretextual.

### 1. Bloomfield Cannot Establish A Causal Connection

Bloomfield filed her first Charge of Discrimination with the EEOC on or about March 21, 2010. However, she was not terminated until August 2, 2010. By itself, this gap of more than four months does not establish a causal connection. *See Kuhn v. Washtenaw County*, No 12-1609, 2013 U.S. App. LEXIS 4799, at *34 (6th Cir. Mar. 2013) (affirming summary judgment where the protected activity and termination were separated by approximately four months because "[t]he relatively short amount of time elapsed does not, by itself, imply causation."). Moreover, where, as here, there is "an intervening legitimate reason to take an adverse employment action," there can be no finding of retaliation based on temporal proximity. *Id*. at *34-35 (holding that, after engaging in protected activity, a deputy's extended discretionary leave and his failure to return to work caused a shortage of available deputies in the Sheriff's Office and constituted an intervening reason for the County to terminate his employment). Just as in *Kuhn*, Bloomfield's refusal to cooperate during the IME constituted an intervening legitimate reason to terminate her employment that is not connected in any way to her EEOC Charge.

### 2. Bloomfield Cannot Establish Pretext

Even if Bloomfield could establish a causal connection, her retaliation claim would still fail because Whirlpool had a legitimate, nondiscriminatory reason for terminating her – she refused to cooperate during the IME and was therefore insubordinate. Bloomfield has not presented any evidence, besides her own belief, that this lawful reason was a pretext for

retaliation. All of the human resources employees who were involved in the termination were deposed and testified consistently that Bloomfield was terminated due to her refusal to cooperate during the IME, and there were no plans to terminate her prior to the IME or regardless of the results of the IME. Traxler Dep. 40:18-41:1; Osting Dep. 82:7-83:19; Hanna Dep. 17:7-17, 23:3-6, 34:18-35:5. Accordingly, Bloomfield's retaliation claim should be dismissed. *Russell*, 537 F.3d at 609-610 (affirming summary judgment on retaliation claim where the plaintiff failed to establish that her employer's reasons for terminating her, which included insubordination, were pretextual).

## V. CONCLUSION

For the foregoing reasons, Whirlpool respectfully requests that the Court issue an Order granting its Motion for Summary Judgment and dismissing Bloomfield's Complaint in its entirety, with prejudice.

## CERTIFICATE OF COMPLIANCE PURSUANT TO LR 7.1(F)

I, Raven A. Winters, an attorney, hereby certify that the instant lawsuit has been assigned to the Standard Track designation, and that the foregoing ***Defendant's Memorandum in Support of Its Motion for Summary Judgment*** is in full compliance with Local Rule 7.1(f) of the Northern District of Ohio, and does not exceed twenty (20) pages in length.

/s/ *Raven A. Winters*
Raven A. Winters

## CERTIFICATE OF SERVICE

Raven A. Winters, an attorney, hereby certifies that, on April 16, 2013, she caused the foregoing ***Defendant's Memorandum In Support of Its Motion for Summary Judgment*** to be filed electronically with the Clerk of the Court using the Court's CM/ECF system. Notification of such filing will be sent to the following:

Danny L. Caudill
Attorney at Law, LLC
7240 Muirfield Drive
Suite 120
Dublin, OH 43017
dlcaudill@caudillfirm.com

/s/ *Raven A. Winters*
Raven A. Winters